# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 8:07CR269 |
| vs. | ) | REPORT AND |
| ZUMARI T. WILSON, | ) | RECOMMENDATION |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Zumari T. Wilson (Wilson) (Filing No. 25). Wilson is charged in the Indictment with co-defendant, Anthony D. Ford (Ford). Count I charges Wilson with the possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g). Count II alleges Wilson possessed less than 5 grams of "crack" cocaine with intent to deliver in violation of 21 U.S.C. § 841(a)(1). Count IV alleges the firearm alleged in Count I should be forfeited pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). Wilson seeks to suppress evidence obtained by the Omaha Police Department (OPD) on May 6, 2007, in Omaha, Nebraska, following a traffic stop of a vehicle in which Wilson was a passenger. Wilson seeks the suppression of evidence seized from the vehicle, any evidence seized from Wilson's person, and any statements Wilson made to OPD officers.

An evidentiary hearing was held on Wilson's motion on September 25, 2007. Wilson was present for the hearing along with his appointed counsel, Assistant Federal Public Defender Julie B. Hansen. The United States was represented by Assistant U.S. Attorney Jennie M. Dugan-Hinrichs. During the hearing, the court heard the testimony of OPD Officers Charles Moffitt (Officer Moffitt), Puht Dek (Sergeant Dek), Raymond Griffin (Officer Griffin), Todd Reeson (Officer Reeson), Eric Goodrich (Officer Goodrich), Joseph Baudler (Officer Baudler), and Arthur Brumfield (Officer Brumfield). The court also received into evidence a videotape of an interview (Exhibit 1), a rights advisory form (Exhibit 2), a consent to provide DNA sample (Exhibit 3), and a gunshot residue information report (Exhibit 4). A transcript of the hearing (TR.) was filed on October 2, 2007 (Filing No. 35).

On October 15, 2007, and with the agreement of the parties, the exhibits were supplemented with a transcript of the videotape interview (Exhibit 1A).

## FINDINGS OF FACT

On the evening of May 6, 2007, there had been reports of two shootings in the Northeast Precinct in Omaha, Nebraska, and officers of the Omaha Police Department were patrolling the area (TR. 4). Around 1:40 a.m., in the vicinity of Ames Avenue and Florence Boulevard, Officer Moffitt had parked his patrol car and was outside of the vehicle allowing his canine to relieve himself (TR. 4). Officer Moffitt heard five to six gun shots coming from the west behind him (TR. 4). Officer Moffitt got his dog and reentered the patrol car which was facing west on Ames (TR. 4). Seeing no foot or vehicle traffic at the time, Officer Moffitt drove west, checked out two cul-de-sacs, and found nothing unusual (TR. 5-6).

As Officer Moffitt continued driving, he saw a white Pontiac drive southbound across Ames into a dead end area containing a Sub Zero Refrigeration business area (TR. 5). Officer Moffitt observed three OPD cruisers coming eastbound on Ames and waved for one of the cruisers to follow the white Pontiac (TR. 6). At the same time, Officer Moffitt observed a white male standing at Ames and 22nd Street waving his arms above his head at Officer Moffitt and pointing to where the white Pontiac had crossed Ames into the Sub Zero Refrigeration area (TR. 6). There was no other traffic in the area (TR. 7). Since the other cruisers were proceeding to the white Pontiac's location, Officer Moffitt drove to the white male and spoke with him (TR. 7).

The male told Officer Moffitt that he (the witness) saw the white Pontiac parked in the back of a house close to 22nd and Ames where the car did not belong. The witness also said he heard gun shots fired and two males run around a tree near the house and run to the car (TR. 7). The witness observed one male get in the driver's side of the white Pontiac and the other male get in the passenger side (TR. 8). The witness said the Pontiac then drove to the location he (the witness) previously pointed out to Officer Moffitt (TR. 8). Officer Moffitt drove to the house where the witness had described the Pontiac was parked (TR. 8). Several other OPD officers were present in the area looking for shell casings and

2

investigating the scene (TR. 8). The victim's (Mrs. Nunn) house was nearby and numerous bullet holes were observed in the house (TR. 9). Other officers found shell casings in the roadway (TR. 9). All of this information was relayed to the officers who had stopped the white Pontiac (TR. 9).

Sergeant Dek was the supervisor of the OPD patrol shift in the Northeast Precinct on May 6, 2007 (TR. 18). Earlier in the evening there had been a large crowd disturbance near 33rd Street and Ames (TR. 18). Numerous OPD officers were present to control the situation (TR. 18). When Sergeant Dek heard Officer Moffitt's radio call of shots fired, Sergeant Dek and several of his crew responded (TR. 18). As Sergeant Dek approached Officer Moffitt's location, he observed Officer Moffitt pointing out the white Pontiac, and shouting "white car" (TR. 18-19; 26). Sergeant Dek followed the Pontiac (TR. 18-19). Sergeant Dek observed the white Pontiac enter a dead end area, make a u-turn, and come back toward him (TR. 19). At that time, Sergeant Dek activated his emergency red and blue lights to stop the Pontiac (TR. 19). Sergeant Dek advised the other OPD patrol vehicles that he had stopped the suspect vehicle and waited for back-up (TR. 20). Other OPD cruisers arrived and a high-risk felony stop was performed (TR. 20). The officers shined their spotlights on the Pontiac and Sergeant Dek ordered the occupants of the Pontiac to show their hands (TR. 20). Sergeant Dek ordered the driver out of the Pontiac with his hands raised and to walk backwards toward the officers (TR. 21). The driver, Ford, complied and when he reached the officers, Ford was frisked and handcuffed (TR. 21). Next, the front seat passenger, Ashley Dolan (Dolan), was ordered to get out of the Pontiac with her hands raised and to walk backwards to the officers where Dolan was frisked and handcuffed (TR. 22). Finally, the back seat passenger, Wilson, was ordered out of the Pontiac with his hands raised and to walk backwards to the officers where Wilson was frisked and handcuffed (TR. 22). The officers then searched the inside of the Pontiac and found no weapon (TR. 23). The officers then traced the path of the Pontiac in the dead end street and found a 9 millimeter gun on the ground fifty to sixty feet behind where the Pontiac was stopped (TR. 24). A check of the firearm indicated it was registered to Laura Bean and the firearm had been reported stolen (TR. 43). Officers reported shell casings found near the victim's house were 9 millimeter caliber casings (TR. 43).

Officer Goodrich assisted in placing Wilson in a police cruiser and determined Wilson's identity (TR. 51-52). Officer Goodrich ran a data check on Wilson and determined Wilson had previous felony arrests (TR. 52). Wilson asked why he was in the police car and Officer Goodrich told Wilson they were conducting an investigation and that as soon as the officers found out something, Wilson would be told (TR. 52). Wilson responded that he did not do anything wrong and did not understand why he was in the cruiser (TR. 52).

Officer Baudler spoke to each of the subjects (TR. 62). He first spoke with Dolan after orally advising her of her *Miranda* rights (TR. 62). Dolan said they were just driving around (TR. 63). Officer Baudler next spoke to Ford and orally advised Ford of his *Miranda* rights (TR. 62). Ford told Officer Baudler he did not know anything and they had done nothing wrong (TR. 64). Next, Officer Baudler spoke to Wilson and orally advised Wilson of his *Miranda* rights (TR. 64). Wilson told Officer Baudler that he (Wilson) had just gotten picked up at Harold's and was getting a ride to his girlfriend's house (TR. 65). Wilson stated he did not know what was going on and that he did not do anything wrong (TR. 65-66). Since Wilson's story did not match with Dolan's, Officer Baudler went back to Dolan and re-interviewed her (TR. 66). Dolan changed her story and provided Officer Baudler with information that Ford and Wilson parked the car near the house that was hit with gunfire and Ford and Wilson had returned to the car after a few minutes (TR. 66). She further admitted hearing gunshots (TR. 67). Wilson was not re-interviewed at the scene (TR. 67).

Wilson, Ford and Dolan were transported separately to Central Police Headquarters (Central) (TR. 46). At Central, when Wilson was being removed from one of the patrol cars, Officer Reeson observed and seized a baggie of "crack" cocaine which fell from Wilson's pant leg to the ground (TR. 47-48).

At Central, Officer Baudler re-interviewed Dolan, Ford, and Wilson in turn (TR. 68-69). After Dolan and Ford admitted the extent of their participation in the incidents and Ford stated Wilson had fired the shots, Officer Baudler spoke with Wilson (TR. 69). The entirety of Officer Baudler's interview was videotaped with audio (TR. 70; Exhibit 1). Due to the difficulty in viewing the videotape, te court directed a transcript be prepared and filed as an exhibit (TR. 72). The transcript was filed on October 15, 2007 (Exhibit 1A).

Wilson's interview began with Officer Baudler reminding Wilson of having been read his rights at the scene (TR. 71; Exhibit 1). Wilson appeared sleepy and groggy. Many of Wilson's responses to Officer Baudler's questions were difficult to hear or were inaudible. However, Officer Baudler testified Wilson was coherent, understood the questions, and did not appear to be intoxicated (TR. 74-75). Wilson gave statements that he was in the area of the shootings that night but denied using or possessing a gun (TR. 73; Exhibit 1). Wilson did make some admissions regarding smoking marihuana on that evening and having some "cack" on his person (Exhibit 1, pp. 23-24). During the interview hand swabs were taken from Wilson (Exhibit 4). Later on June 29, 2007, Wilson, after signing a consent form, provided Officer Brumfield DNA samples (TR. 82; Exhibit 3).

## LEGAL ANALYSIS

Wilson was the passenger in an automobile stopped for investigation in a shooting. Police officers heard shots being fired and followed a car driving from the area of the shooting and pointed out by a bystander. The car was stopped and the occupants were detained pursuant to an investigative detention authorized by **Terry v. Ohio**, 392 U.S. 1 (1968). Nothing was found in the car, but a firearm was found discarded in the immediately vicinity of tire tracks of the car. The female passenger admitted that Wilson and Ford had run to the car after she heard shots fired. Accordingly, the officers had probable cause to detain and arrest Ford and Wilson for the shootings.

Wilson was fully advised of his **Miranda** rights by Officer Baudler while at the scene, and Wilson chose to speak with Officer Baudler without counsel. When Wilson was brought to Central, Officer Baudler, in good faith, reminded Wilson of his rights but did not re-advise Wilson of those rights. A re-advisement of such rights is not required when the suspect is re-interrogated shortly after being transported from the scene where he was so advised of the **Miranda** rights. **Miller v. United States**, 396 F.2d 492, 496 (1968). The court finds Wilson's statements to have been voluntarily made and admissible in evidence.

Further, the taking of gunshot residue swabs of a detainee is not a search implicating the Fourth Amendment any more than the taking a detainee's fingerprints. **United States v. Richardson**, 388 F.2d 842, 845 (1968). Wilson's provision of the DNA

5

sample was given after having been advised in writing of his rights to refuse. The court finds the sample to have been voluntarily given and admissible in evidence.

It is recommended that Wilson's motion to suppress be denied in its entirety.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Wilson's motion to suppress (Filing No. 25) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 4th day of December, 2007.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge